Next we will hear a State of Wilford Deweese v. Hancock, No. 25-1161. Mr. Bryant, you may proceed. May it please the Court. My name is Raymond Bryant and I represent the plaintiff and the appellant in this case, the Estate of Wilford Deweese. On 12b-6 review, the District Court below granted the officers qualified immunity for the intermediate and the deadly force used against Mr. Deweese, which ultimately created a domino effect that killed him. On de novo review today, we ask this Court to reverse that qualified immunity decision because clearly established law strongly supports at least two main theories of excessive force under the circumstances. Number one, the canine deployment violated clearly established law because at the time the officers ordered the canine to attack, they lacked any substantial justification under the second two gram factors. Number two, the canine police rush independently violated clearly established law because the overwhelming force onslaught recklessly created the officer's own purported need to use deadly force under the circumstances. That's that domino effect that led to catastrophe in this case. On the canine deployment. In a way, counsel, the claims kind of go together, don't they? This risk creation argument you're making was the release of the dog. Well, yes, your Honor. It was actually the total force rush, though. The case law on recklessness. Well, all right. They approached him, but when it comes right down to it, isn't the release of the dog your prime argument for risk creation? I think that's the first argument, your Honor, but not the only argument. I didn't say that. Isn't it your main argument? It is the main argument, your Honor. All right. Thank you. And before releasing the dog, why wasn't it reasonable for the officers to consider Mr. Deweese a threat given that they knew he displayed a gun at a bar, said he would shoot the dog, and although maybe there were some mixed messages, wasn't exactly complying with police commands? Well, your Honor, I think that Mr. Deweese was compliant with a number of commands. But he wasn't complying with the command to approach the police. He was keeping his distance. And you're really not addressing the question as a whole, which is why wasn't it reasonable for the police to consider him a threat given the combination of circumstances they were facing before they released the dog? Mr. Deweese never displayed a firearm. But they knew he had in an altercation. But your Honor, why isn't that a problem? I mean, that's why they're there. They were called in because he was in an altercation and he had a gun. Yes, your Honor. He was pushed to the ground. He was assaulted at the bar. Did they know that? Yes, your Honor. Officer LeBaron was dispatched to the scene. But they knew he had a gun. And when the police respond to a situation where the suspect has a gun, wouldn't they be on guard for potential threat under those circumstances? Absolutely, your Honor. Being on guard is very different than using force, affirmative force, to assault that person. But it was more than just that he had the gun. He wasn't complying with what police were asking him to do. Well, your Honor, the only thing he did not comply with is the request to... And he threatened to shoot the dog. Your Honor, he only threatened to shoot the dog long after almost 20 minutes had passed. Yeah, but shooting the dog means pulling out a gun and having a gun in police and public presence. I'm just saying, why couldn't it be reasonable for them to consider him a threat? You can argue that their response to that threat was excessive. But to dismiss completely that they had a reasonable basis to think it's a threat doesn't seem to square with the facts they had in front of them. Your Honor, a possible threat is very different from an imminent threat. No, not a possible threat, a threat. Your Honor, Mr. DeWeese never threatened any officer. He did not verbally... I understand your argument, counsel, but those were the facts that the police were confronting. And it seems like you're denying them completely as being relevant to whether he posed a threat. No, your Honor, I'm not denying them. All right, why don't you go on? I think I understand your point. I think you understand my question. Your Honor, for 20 minutes, Mr. DeWeese remained still in stasis. He didn't threaten anybody. He didn't flee arrest. He remained static. He awaited for the officers to do whatever they were going to do. He tried to explain himself. He tried to call a lawyer for advice. He is not an aggressive person. He never made any hostile motions. And as his court in Rosales pointed out, there's a fundamental distinction between mere possession of a weapon and making hostile motions. It wasn't just possession. He displayed the weapon at the bar. Yes, he did, your Honor. And he threatened to use it against the dog. All in self-defense. It wasn't just that he had a weapon. Your Honor, as this court found in Ortega v. Grisham just last year, the state's not permitted to view somebody exercising their Second Amendment rights with suspicion automatically. Mr. DeWeese only possessed his weapon and displayed it in self-defense. Threatening to shoot the dog, is there a Second Amendment right to shoot the dog? Absolutely, your Honor, if that dog is lunging to bite you. Is there a Second Amendment right to threaten to shoot the dog? It's a conditional warning of self-defense, your Honor. That's an interesting theory of the Second Amendment, counsel. You got any authority for that? Well, your Honor, the Second Amendment has not come up in the intersection of Fourth Amendment very often. However, it's inevitable since the Heller case was decided in 2008, which finally decided that each individual has an individual right to keep and bear arms. Follow that up with the Bruin decision, your Honor, where every individual has a right to not only have a firearm, but use and display it for self-defense purposes. Let me ask you this. So let's just, since we're talking about it, just because I have a Second Amendment right to have a firearm, doesn't mean that it shouldn't be considered threatening by police if they're in an encounter with me, does it? No, your Honor, but again, mere possession is different. No, I understand, but it's definitely something they need to, they need to consider when they're interacting with someone. The police need to, you know, if I don't have a gun, I may be someone they can interact with a lot different than if I do. You're right, your Honor. Okay. And to Judge Matheson's point, if I just have a gun and nobody thinks I've ever pulled it out of my pocket to do anything with it, that might be different than if I'm a police officer and I've been notified that my suspect has pulled the gun on somebody. Yes, that's fair, your Honor. Okay. So in the totality, I mean, those are worthwhile things for them to be thinking about. Absolutely, your Honor, but the context matters, right? Did Mr. DeWeese aggress upon another person in a menacing manner? That's not the situation here. And when the officers went to the scene, they would have found that out by talking to witnesses at the bar, that he was pushed down to the ground. He's in a foreign place, your Honor. He's an older man at 67 years old. He brought that gun as a concealed carry holder to defend himself. He did not pull it out to harm anyone. He only tried to pull it out and actually stuck on his pants, your Honor. So we're not talking about a person who even pointed a gun at any other person. So we're completely talking about a self-defensive situation, both at the bar and on the scene. Well, let me ask you about the canine deployment. I mean, two things seem important with canine deployments, adequate warning and a peaceful surrender opportunity. And they've been asking him to surrender for a while. They wanted him to come over to them in a way where they could keep, you know, tabs on him where he couldn't be a threat to them and he didn't comply. And they told him, if you don't come over here, we're going to turn the dog loose on you and he's going to bite you. Yes, your Honor. I mean, that seems like a reasonable, I mean, that's what they're supposed to do before they turn a canine loose on someone. Well, yes, your Honor, before they turn a canine loose with justification. But of course, as this court announced in Luthi v. Kyle, an officer does not have justification to deploy a canine if there's no elements on the second or third gram factor, if there's no immediate threat at the time the canine is deployed or if that person is not fleeing or resisting at the time. If you're an officer, do you think it's weird that you've been talking to a guy for 20 minutes and he still just still won't come over to you, still won't engage? Yes, I think that could be curious, your Honor. Yeah. But this, again, is a 67-year-old man who had been to several bars. There's a good chance he may have been intoxicated, but he was certainly terrified of those officers pointing guns at him and of the barking, aggressive-looking canine, your Honor. This court has excused the passive... That may be true, but it makes it a lot different than the Luthi case. Yes. I mean, that case, they really didn't even know what was going on. They just walked up to the window and turned the dog loose inside. This case, they knew the guy. They'd been dealing with him for 20 minutes. They were trying to get a handle on the situation. The bottom line is Mr. DeWeese was afraid, your Honor. He was afraid of a firing squad of officers pointing guns at him in a foreign place. He was afraid he didn't know these police officers. He was afraid of that barking dog that stopped anybody from communicating for the last seven minutes of the encounter. As a person who had been trained in firearm use as a licensed gun holder was, he knew that the safest, most prudent play was to do nothing and to remain still. That way, walking towards the officers or any other movements he might make could not be misconstrued as furtive movements. And that's what he did, your Honor. The fear-driven, passive failure to comply with a command has been forgiven in numerous cases. For example, in Davis v. Clifford, your Honor, and also Buck v. City of Albuquerque, your Honor. Those are situations where officers are demanding compliance, and those people are not complying. They're passively failing to comply. They're not refusing. They're not obstructing. They're simply not fully complying. And that's the situation here, your Honor. He was afraid. How does Luke G. and Vette, I think those are two of your clearly established law cases, I'm just not seeing how they help you that much. Luke G., the person was in bed, and the other one, Vette, the person was subdued. This is a really different situation than those cases. It's not materially different, your Honor, because the key question is whether the officers had information on immediate threat at the moment of deployment, and whether they are facing somebody who's fleeing or resisting. There's no flight or resistance at the time of deployment. I understand your argument, and I guess that's really the question. And your Honor, you were on the- Are they materially or are they not materially? And yes, I know, I've been on a panel. But let's go to the deadly force claim. Once Mr. DeWeese pointed the gun to shoot at the police dog, and I understand he was pointing at the dog, not at the police, but why wasn't that a threat to the police and the public at that point? Your Honor, I am very well aware that this circuit has given considerable deference to police officers in sudden emergency situations, but this was not one. And I asked this Court to look at this case differently, because the officers had the advance notice, the advance warning that this person did have a weapon, but didn't pull it out for 20 minutes, didn't threaten anybody, but then told them, if the dog is sent to attack, I'm going to defend myself. This is someone in fear. This is someone who is merely trying to defend themselves. This is not someone who's hostile. This is not somebody who's making any motions that are hostile. Well, okay, but I'm not sure you're directly answering the question. Accepting all of that, you've still got someone who has a gun out, is pointing it, and starts shooting. Why doesn't that pose a danger to just about everyone there? I mean, aside from the fact that he had given the warning and acted completely consistent with this warning. We've been through all that, but you've got someone shooting a gun, and there's lots of people around. Why isn't that dangerous? I understand, because the officers incited that response. Well, that's a different argument. I'm just asking whether it was dangerous. The incitement, we can get to, but why isn't that a dangerous situation for the officers and potentially the public? I think it raises a reasonable dispute of fact question for a jury to determine whether it was truly dangerous. Just like in the Pauley v. White case, Your Honor, where the Pauley brothers poked guns out the window in response to the officers yelling, come out or we're coming in. That was another gun-pointing situation where the officers were about 50 feet away. Here, similarly, the officers were 20 to 30 yards away from Mr. DeWeese, a considerable distance. They were up behind police cars. They're pointing their firearms. They had plenty of cover. They had plenty of distance. There was no real immediate threat from that. So it wasn't until the dog... I'm not sure how comforting that would have been to the people on the scene. Your Honor, I know it can be scary for police officers in sudden emergency situations, but I just want to point out that this was not one. The officers knew what was going to happen if they deployed that dog beforehand, and that's why this is a that the deployment of the dog was appropriate. That basically gets your theory. No, Your Honor, and that's what the district court erred in finding as well, because there's a separate theory of excessive force that goes along with deployment of the dog as compared to reckless incitement. What you need for reckless incitement is reckless conduct that precipitates a self-defensive reaction. What was the reckless conduct? The reckless conduct is the police and the overwhelming onslaught. Okay. This is what you were talking about at first, about it's not just the dog. It's that the cops arrest him too. Yes, Your Honor. Okay. The key question, as Judge Matheson found in the Flores case, is whether it would be reckless beyond debate. So that's the question. When officers have a high degree of knowledge that a risk of some sort of self-defensive response is coming, that is when you have reckless incitement. That's when you have the degree of knowledge required for this different theory of excessive force. Okay. So don't you have them in a trap in that situation? So they deploy the dog that goes over and chews Mr. DeWeese up, and they're not close enough to come take the dog off of him, and then they have an excessive force claim for the dog chewing him up. Yes, Your Honor. I do believe that there's an excessive force claim for deployment of the canine following Lucci. And it's not exact parallel in fact to Lucci, as you've all pointed out. However, the holding in Lucci found that, based on the law before the date of this incident in February 2022, that any reasonable officer would know you shouldn't be deploying a canine or any intermediate force without substantial justification. I just have a point, a question for clarification, if you don't mind. I think I know the answer, but I want to hear it from you. In your brief that a couple places, and I'll just mention page 18, page 8, it almost seems like it's arguing that the state is alleging a third claim for reckless incitement. I don't think you intend to do that, do you? Isn't it just the canine release and the deadly force? No, Your Honor. There are three separate theories of excessive force. All right, but you only allege two claims in your complaint, and those are what they are. And you have this, you allude to this a couple of times in your brief, but I don't see you saying there's a third claim. Are there three claims or are there two claims? There are three theories, Your Honor, and in our complaints... But two claims? Two claims. One of them contains two theories, Your Honor. Okay, which one has two theories? The deadly force claim, Your Honor. Okay, that helps me. And that's important because the reckless incitement precedent this court has found primarily applies to deadly force situations. Thank you. That's all I needed to know. All right, thank you. I see that my time is almost up. I'd like to preserve the remainder. Thank you. Mr. Eddy, you may proceed. Thank you, Your Honors, and may it please the Court. I'm Attorney Jonathan Eddy, appearing on behalf of Officers Hoover and Schilke and arguing on behalf of all defendants. The estate has again failed to overcome either prong of defendants' qualified immunity defense. The allegations taken as true show that officers were called to respond to an armed individual who had secluded himself within a confined, unlit, narrow walkway in the heart of downtown Manitou Springs. Here, the officers pleaded with Mr. DeWeese for 20 minutes and told him that if he did not come out with his hands up, that a police dog would be sent in to subdue him. How long did they give him after they told him they were going to let the dog loose? How long did they give him before they did turn the dog loose? Under the allegations of the complaint, it was seven minutes. But instead of complying with these orders that went on for a total of 20 minutes, and seven minutes specifically with respect to the dog, Mr. DeWeese instead threatened to shoot the dog and remained in the position he was standing in. Now, this allegation is important because it either, one, shows as a matter of fact that DeWeese was armed, or two, at the very least, it reinforces the officer's objective belief that he was. Secondly, it also reinforces the exigency of this situation by telegraphing to the officers that Mr. DeWeese would have been more than willing to discharge a firearm in the heart of a public square. The estate has not alleged a plausible constitutional violation under these allegations, and it has not identified clearly established law that would have shown excessive canine force under these allegations. Specifically, none of the cases that the estate has identified would make clear to every reasonable officer that deploying a canine to subdue an armed, non-compliant suspect would violate the Fourth Amendment beyond debate, especially where that suspect refused lawful commands for 20 minutes and posed a threat to the public and the officers equally. With respect to the deadly force claim, Your Honor, the estate alleges that Mr. DeWeese, the officers rather, did not open fire until Mr. DeWeese pulled the gun from his pocket as the the the estate alleges that DeWeese was only trying to shoot the police dog, as Mr. Raymond suggested, and that he therefore posed no threat to the officers or the public. Now, even accepting this allegation is true, Mr. DeWeese's subjective mindset is irrelevant. Whether he was in fear for his life subjectively is irrelevant under Graham. It's as this court mentioned earlier, it comes down to the perspective of the reasonable officer on scene. Here, no reasonable officer could have been expected to hold fire long enough to decisively and definitively assess what Mr. DeWeese's true intentions were when he pulled out a gun. Well, counsel, does it matter who shot first? Didn't the police fire the first shot? Under the allegations, the allegations suggest that the police did fire first. However, those shots were not fired until Mr. DeWeese removed the gun from his pocket. I understand. I'm just asking who shot first and does that matter? Under this situation, it does not. And so to answer your question, per the allegations, the police shot first. And under this situation, it doesn't matter given the holdings and Larson and other. Do you think we could pin this down a little more than saying the allegations? What are we working with here? Who shot? Who shot first? Do we have to? I know there's been some debate about whether the district court got that right. So given that we're dealing with Rule 12B6, we have to accept the allegations as they are. Under the allegations, the officers shot first. Now, later on after discovery, that will obviously be something that's disputed. But for purposes of the motion to dismiss, the officers concede that the allegations are that they did shoot first. However, those shots were not fired until Mr. DeWeese removed the gun from his pocket. And that is made clear from the allegations. And so pursuant to Larson, officers need not even wait to see the glint of steel before they open fire. Here we had a situation where the gun is coming out of the pocket and pointing as the officers open fire. Why don't you put this in terms of the law on deadly force, the justification to use deadly force. And if Mr. DeWeese hadn't fired the gun, police fired first, do you still have a justification to use deadly force? Can you address it from that standpoint, Tennessee versus Garner? Well, you certainly do, Your Honor. I mean, under the Larson sub-factors, I mean, just the act of pulling out the gun and pointing it would have manifested a hostile... At the dog. Correct. But the allegations don't say that the officers at that time knew that the gun was coming out for the sole purpose of shooting the dog. A reasonable officer on that scene, rushing into a potential felony suspect who had been non-compliant for 20 minutes, they see a gun come out, you know, it's not up to them to essentially make the gamble with their own lives where getting it wrong could have proved suicidal, as this court held in Belmont. Are you also saying it doesn't matter that Mr. DeWeese said in advance that he would use the gun to shoot the dog? That's all he said he was going to use the gun to do. That's certainly part of the totality of the circumstances in the consideration, but I think ultimately it comes down to would a reasonable officer in this situation, could a reasonable officer still conclude that the act of a gun coming out as officers are going in to subdue him, given everything that happened in the 20 minutes leading up to this, could that officer reasonably believe that there was a deadly threat, whether to the officers themselves or from an errant bullet that would have struck another member of the public, given the fact that they're literally standing in the middle of downtown Manitou Springs. Does that answer your question, Your Honor? Yes, thanks. So the estate has also now provided any clearly established law with respect to either of the theories or claims for relief. What about Allen and Ceballos on a clearly established law for risk creation underlying the deadly force claim? The theory is that it was reckless to release the dog and we have the onslaught argument, police approaching Mr. DeWeese, and the police really created or raised the temperature to the point where the danger was something that they were at least responsible enough for this reckless incitement theory to have some traction here. So looking at it from clearly established law, why aren't Allen and Ceballos good cases for the estate? Right, so you still would have under the prong to clearly established analysis, you would still have to go through and analogize Allen, Ceballos, in addition to Bond, which is in the brief. But what's different about those cases is all of those cases involved allegations of officers rushing into situations within seconds of arriving on scene, where the suspects in those situations were confined. For one, we're known to have a mental illness or some sort of emotional distress or emotional disorder issue going on at the time, in addition to the fact that they were all contained on private property and therefore did not pose that greater risk to the public, unlike what we had in this situation. So I would distinguish those three cases, Allen, Ceballos, and Bond on those facts, similarly to what the district court did in this situation here. Just some quick points, your honor, with respect to some of the things that the estate mentioned this morning. You know, with respect to the Polly case, that case was distinguished in the briefing as well. I mean, the main difference in that case is the fact that there the officers did not identify themselves and gave the individual in question reason to believe that they were actually burglars or home intruders that were threatening to come inside of his home. That's not the situation here, your honor. The officers clearly identified themselves for over 20 minutes prior to using any force in this case. I mean, doesn't that cut both ways? I mean, the delay in this case seems like it might cut both ways because they have, like you were just talking about the Allen and Ceballos case and the Bond case, and the immediate response in those cases as opposed to a 20-minute delay. And it seems like when you take this much time and after 20 minutes of discussions and things, and he doesn't make any threatening gestures or movements that it might be less justifiable to rush in. Well, perspectively, your honor, I would disagree. I think that it just shows that the officers tried their very best to exhaust every possible resource that they had in that very limited situation. But again, it comes down to similar to the situation in Flores. It comes down to a matter of exigency. So in Flores, the exigency was, well, we have this potentially armed, dangerous individual in a home that potentially poses threats to other people in the home. Therefore, the officer's precipitating conduct in Flores, which was the the protective sweep, was deemed justified and not reckless. Therefore, the use of deadly force was not reckless. In this case, the exigency is a little different, but it still existed. The exigency here was the fact that we had an armed, non-compliant individual in the heart of downtown Manitou Springs. What were the allegations in the complaint about, you know, sort of the number of people that were in downtown at the square at this time? So there's no allegations as to how many people were around. I mean, we don't even know from the complaint if there was anybody. It looks like it's at night. Certainly not any. I mean, obviously they probably wouldn't be walking in front of the officers. But there's, you know, without any indication of how much of the public was present. I mean, how at this stage do we even make a determination of what the exigency was? I think there could still be a determination made here. So two points to that. So one, the complaint, the images in the complaint basically admit that there was at least one person around. It was the civilian that was videotaping this whole thing. And those photos are obviously included in the complaint and therefore can be reviewed. Secondly, it's the fact that he was in the heart of a public square downtown from the perspective of a reasonable officer who is essentially tunnel vision, focused on the threat directly in front of him. Could that reasonable officer believe that perhaps there were members of the public behind him or her at that time? And under these allegations and under the facts of this case, I think the answer to that is yes. And so that should be considered in this case and in favor of the officers. Okay. So unless the court has any further questions, that's all I have. I'll reserve the rest of my time. Thank you. Thank you, counsel. Okay. I think Mr. O'Brien used up his time and went over. Oh, was I over? Yes. Sorry about that. I think we're at the end. So we will consider the case submitted. Counsel are excused. Thank you for your arguments. They were helpful. Thank you.